### IN THE UNITED STATES DISTRICT COURT
### FOR THE WESTERN DISTRICT OF TEXAS
### AUSTIN DIVISION

**TEXAS DIVISION, SONS OF CONFEDERATE
VETERANS, INC.; GRANVEL J. BLOCK; and
RAY W. JAMES,**

                **Plaintiffs,**

**-vs-**                                **Case No.  A-11-CA-1049-SS**

**VICTOR VANDERGRIFF in his official capacity
as Chairman of the Texas Department of Motor
Vehicles Board; CLIFFORD BUTLER in his
official capacity as a member of the Board;
RAYMOND PALACIOS, JR. in his official
capacity as a member of the Board; BLAKE
INGRAM in his official capacity as a member of
the Board; CHERYL JOHNSON in her official
capacity as a member of the Board; LAURA
RYAN in her official capacity as a member of the
Board; MARVIN RUSH in his official capacity as
a member of the Board; and JOHN WALKER, III,
in his official capacity as a member of the Board,**

                **Defendants.**

-----

### O R D E R

      BE IT REMEMBERED on this day the Court reviewed the file in the above-styled cause, and

specifically Plaintiffs Texas Division, Sons of Confederate Veterans, Inc, et al. (SCV)'s Motion for

Summary Judgment [#35], Defendants Victor T. Vandergriff et al. (DMVB)'s[1] Response [#38]

thereto; the DMVB's Motion for Summary Judgment [#37], the SCV's Response [#39] thereto, and

-----

[1]The Court will refer to the Defendant board members of the Board of the Texas Department of Motor Vehicles
collectively as the "DMVB" in this opinion.

the DMVB's Reply [#43]. Having considered the documents, the file as a whole, and the governing law, the Court now enters the following opinion and orders.

## Background

The issue before the Court is this: does the First Amendment require a state government to place the Confederate battle flag on customized, special license plates at the request of a nonprofit organization which has otherwise complied with state rules governing issuance of such plates? The Plaintiffs are the Texas Division of the Sons of Confederate Veterans, Inc., an organization dedicated to preserving the memory of those Americans who fought for the Confederacy during the Civil War, as well as the present and former "Commanders" of the Texas Division of the SCV. The SCV's membership is limited to male descendants of Confederate veterans. The Defendants are the board members of the Texas Department of Motor Vehicles Board, and are sued in their official capacities. Among its many duties, the DMVB is tasked with final approval of proposed "specialty license plates." The SCV claims its First Amendment rights have been violated by the DMVB's refusal to issue a proposed Sons of Confederate Veterans specialty license plate. The SCV's seal prominently incorporates the Confederate battle flag, which is the flag Confederate troops fought under during most of the Civil War, and which is also the flag most closely associated with the Confederacy in popular memory.[2] The SCV seeks to compel the DMVB to approve its specialty license plate, featuring the name and seal of the Sons of Confederate Veterans organization. Apparently, the SCV has successfully had similar plates issued by the states of Alabama, Georgia, Louisiana, Maryland,

---

[2]As its name suggests, however, the battle flag was not the national flag of the Confederacy, but rather was adopted for field use because—when viewed at a distance, and through the smoke of battle—the first national flag of the Confederacy could not be readily distinguished from the American flag borne by Union troops. This accounts for the (immaterial) dispute before the DMVB (discussed below) as to whether the battle flag was ever "flown over" the state of Texas as a sovereign flag. It does bear noting the second and third Confederate national flags both prominently incorporated the battle flag in their cantons. Pls.' Mot. Summ. J. [#35] at 3.

Mississippi, North Carolina, South Carolina, Tennessee, and Virginia. Pls.' Am. Compl. [#10] ¶ 4.18. The Court will now describe in turn (1) the various ways in which the state of Texas issues specialty license plates, (2) the Confederate battle flag and its significance, and (3) the SCV's applications to obtain a specialty plate, the denial of which underlie this case.

## I.     The Specialty Plate Programs

Texas has three avenues by which individuals or organizations may apply for the creation of a new specialty plate.[3] The first way is through direct legislative action, by which the Texas legislature authorizes specific plates. These plates are codified in Chapter 504, subchapter G of the Transportation Code. TEX. TRANSP. CODE §§ 504.601, .602–662; *e.g.*, *id.* § 504.662(a) ("The department shall issue specially designed license plates that include the words 'Choose Life.' The department shall design the license plates in consultation with the attorney general."). Taking the latter as an example, $22 from the sale and renewal of each "Choose Life" plate goes to a fund administered by the Texas Attorney General, to support nonprofit organizations which provide free "counseling and material assistance to pregnant women who are considering placing their children for adoption," and which do not provide abortion-related services. *Id.* § 504.662(b); TEX. GOV'T CODE § 402.036(g). Most of the other statutory plates relate to less controversial subjects, and apparently the Texas Department of Transportation, which previously reviewed proposed specialty plates, repeatedly rejected "Choose Life" designs as being too controversial, under prior regulations.

---

[3]Regardless of their origin, once a plate is approved, drivers pay an extra fee in addition to the regular vehicle registration fee to obtain the desired specialty plate. 43 TEX. ADMIN. CODE § 217.28(b)(2). The proceeds from the fee are divided in various ways depending on how the plate was created, but typically funds benefit both the entity which proposed the plate, and a state agency with similar goals. For example, proceeds from the SCV's proposed plate would have benefitted both the SCV itself, and its sponsoring state agency, the General Land Office, for the purpose of preserving historical monuments and records.

Pls.' Mot. Summ. J. [#35-8], Ex. F, at 6.  Like the DMVB-approved plates discussed below, statutory plates are available to the public through the DMVB's website.

The second route, at issue here, is through an agency approval process, originally overseen by the Texas Department of Transportation, but then assigned to the Department of Motor Vehicles Board.  TEX. TRANSP. CODE § 504.702.  Throughout this opinion, the Court will typically mean this program, supervised by the DMVB, when referencing the "specialty plate program."  This route is limited to nonprofit organizations.  *Id.* § 504.801(b).  If the nonprofit group's plate is approved, a share of the proceeds from sales of the plate is given to the nonprofit.  Although the statute states, "[t]he department shall design each new specialty license plate in consultation with the sponsor, if any," *id.* § 504.801(c), by rule and practice nonprofit groups, such as the SCV, propose the design, while the DMVB's input appears to be limited to (1) technical reformatting of a design to enable it meet visibility, distinctiveness, and reflectivity requirements, and (2) rejecting applications which otherwise do not conform to the various statutory and rule requirements for a specialty plate.  Entities seeking approval of a plate by the DMVB may affiliate with a state agency as a sponsor,[4] in which case a share of the proceeds (less administrative costs of $8) from sales of the plate ($22 per plate) goes to the state agency, which in turn passes on a portion to the nonprofit entity.[5]  *Id.* § 504.801(e).  Otherwise, all proceeds go to the state highway fund.  *Id.*  Nonprofit organizations proposing a

---

[4]Confusingly, the statute refers to plate applicants as sponsors, while certain DMVB publications refer to the affiliated state agency supporting the plate as the sponsor.  The Court will generally use "sponsor" to refer to any affiliated state agency, and "applicant" to refer to the nonprofit entity seeking issuance of a specialty plate.

[5]Because the SCV seeks to compel issuance of its proposed plate, which would therefore result in additional revenue for the state, the Court previously rejected DMVB's argument this suit is barred by the Tax Injunction Act.  Order of Mar. 7, 2012 [#27] at 6.

specialty plate must pay an $8,000 deposit to cover the administrative costs for the first 1000 plates sold, which is reimbursed if plate sales and renewals exceed 1000.

Both statutes and regulations govern the DMVB's review of proposed plates. "The department may refuse to create a new specialty license plate *if the design might be offensive to any member of the public*, if the nominated state agency does not consent to receipt of the funds derived from issuance of the license plate, if the uses identified for those funds might violate a statute or constitutional provision, or for any other reason established by rule." *Id.* § 504.801(c) (emphasis added). Pursuant to the foregoing, the DMVB has promulgated rules which incorporate section 504.801, and which also direct the DMVB to consider the following:

> (B) the proposed license plate design, including:
>> (i) whether the design appears to meet the legibility and reflectivity standards established by the department;
>> (ii) whether the design meets the standards established by the department for uniqueness;
>> (iii) other information provided during the application process;
>> . . .
>> (v) whether a design is similar enough to an existing plate design that it may compete with the existing plate sales; and
> (C) the applicant's ability to comply with Transportation Code[] §504.702 relating to the required deposit or application that must be provided before the manufacture of a new specialty license plate.

43 TEX. ADMIN. CODE § 217.28(i)(5)(B)–(C).

In addition, the prior version of the DMVB rules, in effect when the SCV plate was rejected, also included factors under which a plate could be considered offensive under Transportation Code section 504.801(c). As relevant here, one factor was whether the plate was "derogatory," defined as an "an expression of hate directed toward people or groups that is demeaning to people or groups,

or associated with an organization that advocates such expressions." Former 43 TEX. ADMIN. CODE § 217.28(c)(3); Pl.'s Mot. for Summ. J. [#35-12], Ex. J, at 1.

Once an application is complete, the DMVB makes the proposed design available for public comment on its website. 43 TEX. ADMIN. CODE § 217.28(i)(6). No sooner than twenty-five days thereafter, the proposed plate is considered as an agenda item at a DMVB meeting. *Id.* The DMVB, at an open meeting, then determines whether to approve or reject the proposed design. *Id.* § 217.28(i)(7)(A). Even if a design is approved, the DMVB "has final approval authority of all specialty license plate designs and may adjust or reconfigure the submitted draft design to comply with the format or license plate specifications." *Id.* § 217.28(i)(8)(B). When a design is rejected, the DMVB will consider an amended design, in a new application, if "the design has been altered to an acceptable degree." *Id.* § 217.28(i)(7)(B)(ii).

Third, the state has also authorized a private vendor, MyPlates.com, to accept new plate applications, and to sell specialty plates to the public, through its own website.[6] Unlike the DMVB's program, this avenue is open to everyone, including for-profit entities. The DMVB nevertheless must approve designs submitted through MyPlates.com. TEX. TRANSP. CODE § 504.6011(a); 43 TEX. ADMIN. CODE § 217.40. The majority of the designs offered by MyPlates.com either offer a different color and style from the standard Texas plate, or bear the logo and name of assorted colleges, universities, and professional sports teams.[7] However, a number of plates displaying the names and

---

[6]As such, the motorist—or jurist—who wishes to review the full range of available plates must peruse two different websites.

[7]Including, in a rather odd juxtaposition (but one which is no doubt popular among persons who, not having been fortunate enough to be born (or to attend school) in Texas, nevertheless got here as soon as possible), many designs for colleges and teams which are located outside the state of Texas. For example, persons who had the good fortune of attending the University of Kansas can purchase a Texas plate which features a certain blue and red bird, and the legend, "JAYHAWKS." MYPLATES.COM, http://www.myplates.com/ (last visited Apr. 9, 2013). The parties have not suggested

logos of nonprofit and for-profit entities are also available, including such stalwart enterprises as Mighty Fine burgers, Freeb!rds burritos, and RE/MAX ("GET IT SOLD WITH RE/MAX").  Pl.'s Mot. Summ. J. [#35-13], Ex. K, at 1; *see also* MYPLATES.COM, http://www.myplates.com/ (last visited Apr. 9, 2013).  Notably, one nonprofit plate, available through MyPlates, is the "Calvary Hill" plate, sales of which "benefit at-risk Texas children."  *Design Series*, MYPLATES.COM, http://www.myplates.com/DesignSeries/PLPD236 (last visited Apr. 9, 2013).  The design of the Calvary Hill plate features the legend "ONE STATE UNDER GOD," and, with obvious Christian symbolism, a silhouette of three crosses on a small rise.  *Id.*; Pl.'s Mot. Summ. J. [#35-13], Ex. K, at 1.

## II.      The Confederate Battle Flag

The Confederate battle flag is a symbol which conveys different meanings to different audiences.  *See A.M. ex rel. McAllum v. Cash*, 585 F.3d 214, 222 & n.5 (5th Cir. 2009) ("As an initial matter, plaintiffs agree that some view the Confederate flag in certain circumstances as a symbol of racism and intolerance, regardless of whatever other meanings may be associated with it. . . . This concession comports with other courts' views of the meanings associated with the Confederate flag.").  To some—including, but by no means limited to, the SCV and its members—the flag is a symbol of pride, heritage, and sacrifice in a noble struggle to preserve states' rights, and an agrarian way of life.  However, to others it is a symbol of an unconstitutional rebellion, aimed at keeping African-Americans in a state of slavery by destroying the Union, with the "states' right" at issue being the right to own slaves.  Unfortunately, it is also used by some modern racists and white supremacists as a symbol of hatred directed towards African-Americans, some of whom

---

the Jayhawks plate is an endorsement of the historical Jayhawkers, however.

in turn ascribe to it a racist meaning.[8]  *See, e.g.*, *Scott v. Sch. Bd. of Alachua Cnty.*, 324 F.3d 1246,

1249 (11th Cir. 2003) (noting the battle flag has multiple "emotionally charged" meanings, and is

viewed by some as a symbol of white supremacy and racism, while others view it as a positive

symbol of heritage).

> It is the sincerely held view of many Americans, of all races, that the confederate flag is a symbol of racial separation and oppression.  And, unfortunately, as uncomfortable as it is to admit, there are still those today who affirm allegiance to the confederate flag precisely because, for them, the flag is identified with racial separation.  Because there are citizens who not only continue to hold separatist views, but who revere the confederate flag precisely for its symbolism of those views, it is not an irrational inference that one who displays the confederate flag may harbor racial bias against African–Americans.

*United States v. Blanding*, 250 F.3d 858, 861 (4th Cir. 2001) (per curiam).

The Eleventh Circuit has noted white supremacists began to adopt the battle flag during the

civil rights movement, as a symbol of opposition to efforts by the federal government to bring about

desegregation.  *Coleman v. Miller*, 117 F.3d 527, 528 (11th Cir. 1997).

> As many of Georgia's politicians and citizens openly resisted the Supreme Court's desegregation rulings, increasing numbers of white Southerners began expressing renewed interest in their Confederate heritage.  It was in this environment

---

[8]As the Eleventh Circuit noted:

> This debate, which is being played out in state legislatures, newspaper editorial columns and classrooms across the South is exemplified in the expert witness disclosures offered by the two sides in this case. The plaintiffs' experts plan to testify that "the Confederate battle flag is not a symbol of racism, but rather a historical symbol embodying the philosophical and political principals of a decentralized form of government in which states and local government retain all powers not expressly ceded to the centralized federal government under the constitution" and that thus the flag is merely "a symbol of southern heritage."  The defendant's expert plans to testify that "from its inception, the confederacy was a political movement dedicated to the preservation of the institution of slavery. Therefore from its inception, the confederacy and its symbols represented approval of white supremacy" and that "the confederate flag is a symbol that has acquired numerous racist associations to the point that the flag itself has understandably come to be perceived as a racist symbol."

> The problem, of course, is that both of them are correct.

*Scott v. Sch. Bd. of Alachua Cnty.*, 324 F.3d 1246, 1248–49 (11th Cir. 2003) (citations omitted).

> of open hostility to the Supreme Court's civil rights rulings and of developing interest in Confederate history that the Georgia General Assembly acted to redesign its state flag. It chose as an official state symbol an emblem that historically had been associated with white supremacy and resistance to federal authority.

*Id.* At issue in *Coleman* was an Equal Protection and First Amendment challenge to the Georgia state flag, adopted in 1956, which included the battle flag, along with the state seal. Indeed, although several legislators did testify to the contrary, one member of legislature asserted the Georgia General Assembly had deliberately incorporated the battle flag into the state flag "as a symbol of resistance to integration."[9] *Id.* at 528. "James Mackay, who was a member of the General Assembly in 1956, testified that 'there was a movement across the South: "Let's adopt the Confederate battle flag as a symbol of resistance to the law of this land."'" *Id.* at 529 n.4. The Eleventh Circuit ultimately rejected the challenge, finding a lack of evidence of any disproportionate impact along racial lines or of any government compulsion to endorse the state flag. *Id.* at 530–31. However, the court was not shy about noting the following regarding the meaning of the Confederate battle flag:

> We recognize that the Georgia flag conveys mixed meanings; to some it honors those who fought in the Civil War and to others it flies as a symbol of oppression. But because the Confederate battle flag emblem offends many Georgians, it has, in our view, no place in the official state flag. We regret that the Georgia legislature has chosen, and continues to display, as an official state symbol a battle flag emblem that divides rather than unifies the citizens of Georgia.[10]

---

[9]Notably, "while addressing the States' Rights Council of Georgia at the beginning of the 1956 legislative session, Governor Griffin announced that 'the rest of the nation is looking to Georgia for the lead in segregation.'" *Coleman*, 117 F.3d at 528. In addition, while it was considering the flag bill, the General Assembly passed the Interposition Resolution, declaring the Supreme Court's rulings in *Brown v. Board of Education* to be null and void. *Id.*

[10]Although legal efforts to remove the battle flag failed, the Georgia Assembly appears to have ultimately agreed, and adopted a new flag in 2001, which relegated the battle flag to a tiny lineup of former state flags along the bottom edge of the 2001 flag. Yet another flag was adopted by referendum in 2003, which abandoned the battle flag altogether, albeit in favor of a design apparently inspired by the first Confederate national flag. Edwin L. Jackson, *State Flags of Georgia*, NEW GEORGIA ENCYCLOPEDIA (Mar. 3, 2009), http://www.newgeorgiaencyclopedia.org/nge/Article.jsp?id=h-2671&hl=y.

*Id.* at 530.

The SCV's predecessor, the United Confederate Veterans, whose members were actual veterans of the Civil War, used the battle flag as its symbol.  Since at least 1924, the SCV has in turn used a logo which includes the battle flag, surrounded by four tabs containing the words "Sons of Confederate Veterans 1896."  Pl.'s Mot. Summ. J. [#35-5], Ex. C, at 4.  There is no dispute the battle flag logo is the only logo used by the SCV, although local divisions sometimes add additional elements to it.  In an apparent reaction to negative associations with the battle flag, the Sons of Confederate Veterans nationally adopted a resolution on September 3, 2010, unequivocally condemning "misuse of the Confederate Battle Flag by any extremist group or individual espousing political extremism and/or racial superiority," and denouncing "the use of the Confederate Battle Flag and any other Confederate symbol by any hate group and/or the Ku Klux Klan as the desecration of a symbol to which any hate group and/or the Ku Klux Klan has no claim."  Defs.' Mot. Summ. J. [#37-4], Ex. 7, at 195.

## III.   Sons of Confederate Veterans' Plate Applications

The SCV applied to the Texas Department of Transportation (TxDOT)—which was then in charge of specialty plate approval—for a plate on August 18, 2009.  Pls.'s Mot. Summ. J. [#35-4], Ex. B, at 1.  Texas Land Commissioner Jerry Patterson, on behalf of the Texas General Land Office, sponsored the application.  *Id.*  The proposed plate featured the SCV logo, and the legend "SONS OF CONFEDERATE VETERANS" at the bottom.  *Id.* [#35-10], Ex. H., at 1.  The Sons of Confederate Veterans specialty plates issued by other states include similar or identical versions of the logo, and several likewise repeat the name of the organization at the top or bottom of the plate.

*Id.* [#35-3], Ex. A, at 1–5.  There is no dispute the SCV's plate complied with the various technical requirements, and there is no dispute the SCV stands ready then and now to pay the $8,000 deposit.

TxDOT, after acknowledging receipt of the application, proceeded to put the plate to an anonymous vote by its seven-member special committee for reviewing proposed plates, via an internal website. *Id.* [#35-2], Ex. 1, at 3.  On December 21, 2009, TxDOT sent SCV a letter denying the plate.  Via an open-records request, the SCV subsequently obtained internal TxDOT emails regarding the plate, which revealed at one point the voting stood 3–2 in favor of the SCV plate, but with two members failing to vote, despite repeated pleas to do so by TxDOT officials.  Although TxDOT officials debated whether the plate had been approved by the three votes, the plate was not moved to the public comment period required under the prior TxDOT regulations, but was instead held for a second vote, at which time the vote was 4–1 against the plate, two TxDOT committee members apparently being still too busy to click an online voting button.

Subsequently, review of specialty plate applications was transferred to the newly created, nine-member DMVB.  On October 27, 2010, the SCV sent a renewed application to the DMVB, accompanied with a cover letter decrying apparent bias by TxDOT officials.  Although the SCV characterizes this action as an "appeal," there is no statutory or regulatory basis for treating it as an appeal.  In any event, the DMVB, proceeding under the regulations described above, treated it as a new application, and opened the plate for public comment.  The DMVB apparently approved the plate as to visibility and technical requirements on March 18, 2011.  *Id.*  Final review of the plate was placed on the agenda for an April 14, 2011 DMVB meeting.  At the April meeting, one board member was absent, and the remaining eight members deadlocked 4–4 in two votes.  DMVB ChairmanVandergriff apparently sought to reschedule the agenda item for a meeting with all

boardmembers in attendance, however various personal difficulties frustrated this, and the SCV plate was ultimately taken up on November 10, 2011, again by only eight DMVB members.

This meeting was apparently well-attended by members of the public, and elicited numerous public comments, some in favor, but most opposed to the plate (which the Court will describe in more detail below). In the months leading up to the November hearing, the DMVB's website also recorded several hundred public comments, the balance of which were against the plate. Defs.' Mot. Summ. J. [#37-2], Ex. 4, at 1. Further, the DMVB received several letters urging rejection of the plate, including from nineteen state representatives, and the mayor of Houston. *Id.* [#37-3], Ex. 5.

Also before the DMVB on November 10, with remarkable timing, was another plate sponsored by Commissioner Patterson, the Buffalo Soldiers plate. This plate was sought by the Buffalo Soldiers National Museum. The Museum honors all African-American soldiers throughout American history, albeit with a focus on the "Buffalo Soldiers," a term referring to those who joined the federal army after the Civil War, and served in the nineteenth-century frontier wars with Native Americans. The Buffalo Soldiers plate features a combined image, incorporating both the Buffalo Soldiers Museum logo (which in turn contains an image of a buffalo, and the words "Buffalo Soldiers National Museum, Houston, Texas") and another logo, comprised of a crossed rifle and sabre, with the words "Buffalo Soldiers" in large, cursive script superimposed. As noted below, some of the comments regarding the SCV plate also referenced the proposed Buffalo Soldiers plate, and the DMVB voted on both in close succession.

After receiving many public comments, the DMVB rejected the SCV plate by unanimous vote.[11] This decision was memorialized in a resolution, which made the following findings:

---

[11]The Buffalo Soldiers plate was approved 5–3, and is now available for purchase by Texas motorists.

Transportation Code, §504.80l(c) authorizes the Board to refuse to create a new specialty license plate if the design might be offensive to any member of the public or for any other reason established by rule. The provision of Title 43, Texas Administrative Code, §217.28(c)(3) lists factors under which a license plate may be considered objectionable or misleading. The objectionable factors include, but are not limited to whether the plate is found to be derogatory. "Derogatory" is defined as an expression of hate directed toward people or groups that is demeaning to people or groups, or associated with an organization that advocates such expressions.

The Board has considered the information and finds it necessary to deny this plate design application, *specifically the confederate flag portion of the design*, because public comments have shown that many members of the general public find the design offensive, and because such comments are reasonable. The Board finds that a significant portion of the public associate the confederate flag with organizations advocating expressions of hate directed toward people or groups that is demeaning to those people or groups.

Pls.' Mot. Summ. J. [#35-12], Ex. J., at 1 (emphasis added). The DMVB resolution also included

an alternative reason for denying the SCV plate:

The Board also finds there is a compelling public interest in protecting a conspicuous mechanism for identification, such as a license plate, from degrading into a possible public safety issue. The department shares a common public mission with several state agencies to protect public safety. The extent of the controversy surrounding this plate may challenge public safety since the design could distract or disturb some drivers to the point of being unreasonably dangerous.

*Id.* at 1–2.

The SCV then filed suit in this Court, asserting its First Amendment rights were violated by

the DMVB. Presently, both sides have moved for summary judgment.

## Discussion

### I.      Legal Standards

### A.      Summary Judgment

Summary judgment shall be rendered when the pleadings, the discovery and disclosure

materials on file, and any affidavits show that there is no genuine dispute as to any material fact and

-13-

that the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–25 (1986); *Washburn v. Harvey*, 504 F.3d 505, 508 (5th Cir. 2007). A dispute regarding a material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict in favor of the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). When ruling on a motion for summary judgment, the court is required to view all inferences drawn from the factual record in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 587 (1986); *Washburn*, 504 F.3d at 508. Further, a court "may not make credibility determinations or weigh the evidence" in ruling on a motion for summary judgment. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000); *Anderson*, 477 U.S. at 254–55.

Once the moving party has made an initial showing that there is no evidence to support the nonmoving party's case, the party opposing the motion must come forward with competent summary judgment evidence of the existence of a genuine fact issue. *Matsushita*, 475 U.S. at 586. Mere conclusory allegations are not competent summary judgment evidence, and thus are insufficient to defeat a motion for summary judgment. *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 343 (5th Cir. 2007). Unsubstantiated assertions, improbable inferences, and unsupported speculation are not competent summary judgment evidence. *Id.* The party opposing summary judgment is required to identify specific evidence in the record and to articulate the precise manner in which that evidence supports his claim. *Adams v. Travelers Indem. Co. of Conn.*, 465 F.3d 156, 164 (5th Cir. 2006). Rule 56 does not impose a duty on the court to "sift through the record in search of evidence" to support the nonmovant's opposition to the motion for summary judgment. *Id.* "Only disputes over facts that might affect the outcome of the suit under the governing laws will properly preclude the

-14-

entry of summary judgment." *Anderson*, 477 U.S. at 248.  Disputed fact issues that are "irrelevant and unnecessary" will not be considered by a court in ruling on a summary judgment motion.  *Id.* If the nonmoving party fails to make a showing sufficient to establish the existence of an element essential to its case and on which it will bear the burden of proof at trial, summary judgment must be granted.  *Celotex*, 477 U.S. at 322–23.

## B.     First Amendment Forum Analysis

The Supreme Court distinguishes between three or four types of forum for First Amendment purposes.   The first is the traditional public forum, such as "streets and parks which 'have immemorially been held in trust for the use of the public, and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions.'" *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45 (1983) (quoting *Hague v. CIO*, 307 U.S. 496, 515 (1939)).  The second category, often referred to as the designated public forum, "consists of public property which the state has opened for use by the public as a place for expressive activity."  *Id.*  In both traditional and designated public forums, the "rights of the state to limit expressive activity are sharply circumscribed."[12]  *Id.*  In these forums, "[f]or the state to enforce a content-based exclusion it must show that its regulation is necessary to serve a compelling state interest and that it is narrowly drawn to achieve that end."  *Id.*   "The state may also enforce regulations of the time, place, and manner of expression which are content-neutral, are narrowly

---

[12]The only practical difference between traditional and designated public forums appears to be the state's power to entirely close a designated public forum; i.e., having created a designated forum, the state is not required to keep it open forever.  *Perry Educ. Ass'n*, 460 U.S. at 46.  By contrast, the state cannot "prohibit all communicative activity" in a traditional public forum—public squares, parks, and the like, must forever remain open for public discourse.  *Id.* at 45.

tailored to serve a significant government interest, and leave open ample alternative channels of communication."  *Id.*

A third category, or perhaps a subset of the second, is the limited public forum.  *See Chiu v. Plano Indep. Sch. Dist.*, 260 F.3d 330, 345–47 & ns.10–12 (5th Cir. 2001) (noting a lack of precision in use of "designated" and "limited" terminology, and the resulting confusion).  "A public forum may be created for a limited purpose such as use by certain groups, or for the discussion of certain subjects."  *Perry Educ. Ass'n*, at 46 n.7 (citations omitted).  Notwithstanding some confusion on terminology, as the Court understands matters, a limited forum is a nontraditional forum, which is additionally restricted to certain groups or to particular topics.  *Id.*  "When a public body establishes a limited public forum of this sort, that body may restrict the expression that takes place within the forum so long as the restriction (1) does 'not discriminate against speech on the basis of viewpoint' and (2) is 'reasonable in light of the purpose served by the forum.'"  *Chiu*, 260 F.3d at 346 (quoting *Good News Club v. Milford Cent. Sch.*, 533 U.S. 98, 106–07 (2001)).

Finally, there is the nonpublic forum, which would appear to be the balance of government owned or controlled property on which expressive activity (usually incidental to other, primary purposes) takes place.  "[T]he First Amendment does not guarantee access to property simply because it is owned or controlled by the government."  *U.S. Postal Serv. v. Council of Greenburgh Civic Ass'ns*, 453 U.S. 114, 129 (1981).  "[T]he mere fact that an instrumentality is used for the communication of ideas does not make [it] a public forum."  *Perry Educ. Ass'n*, 460 U.S. at 49 n.9.

> Public property which is not by tradition or designation a forum for public communication is governed by different standards.  We have recognized that the "First Amendment does not guarantee access to property simply because it is owned or controlled by the government."  In addition to time, place, and manner regulations, the state may reserve the forum for its intended purposes, communicative or

otherwise, as long as the regulation on speech is reasonable and not an effort to suppress expression merely because public officials oppose the speaker's view.  As we have stated on several occasions, "the State, no less than a private owner of property, has power to preserve the property under its control for the use to which it is lawfully dedicated."

*Id.* at 46 (citations omitted).   The Supreme Court subsequently expounded on nonpublic forums as

follows:

> The government does not create a public forum by inaction or by permitting limited discourse, but only by intentionally opening a nontraditional forum for public discourse.  Accordingly, the Court has looked to the policy and practice of the government to ascertain whether it intended to designate a place not traditionally open to assembly and debate as a public forum.  The Court has also examined the nature of the property and its compatibility with expressive activity to discern the government's intent.  For example, in *Widmar v. Vincent*, 454 U.S. 263, 102 S.Ct. 269, 70 L.Ed.2d 440 (1981), we found that a state university that had an express policy of making its meeting facilities available to registered student groups had created a public forum for their use.  The policy evidenced a clear intent to create a public forum . . . . Additionally, we noted that a university campus, at least as to its students, possesses many of the characteristics of a traditional public forum.  And in *Madison Joint School District v. Wisconsin Employment Relations Comm'n*, 429 U.S. 167, 97 S.Ct. 421, 50 L.Ed.2d 376 (1976), the Court held that a forum for citizen involvement was created by a state statute providing for open school board meetings.  Similarly, the Court found a public forum where a municipal auditorium and a city-leased theater were designed for and dedicated to expressive activities.

> Not every instrumentality used for communication, however, is a traditional public forum or a public forum by designation.  "[T]he First Amendment does not guarantee access to property simply because it is owned or controlled by the government."  We will not find that a public forum has been created in the face of clear evidence of a contrary intent, nor will we infer that the government intended to create a public forum when the nature of the property is inconsistent with expressive activity.  . . . Similarly, the evidence in *Lehman v. City of Shaker Heights*, . . . revealed that the city intended to limit access to the advertising spaces on city transit buses.  It had done so for 26 years, and its management contract required the managing company to exercise control over the subject matter of the displays. Additionally, the Court found that the city's use of the property as a commercial enterprise was inconsistent with an intent to designate the car cards as a public forum.  In cases where the principal function of the property would be disrupted by expressive activity, the Court is particularly reluctant to hold that the government

-17-

intended to designate a public forum.   Accordingly, we have held that military reservations, and jailhouse grounds, do not constitute public fora.

*Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 802–04 (1985) (certain citations omitted).   From the foregoing, the following factors for consideration can be distilled: (1) the policy and practice of the government, (2) the nature of the property, (3) limited access, (4) the property's compatibility with expressive speech, and (5) any evidence of contrary intent.   *See id.*   As the Fifth Circuit has cogently put it: "The government does not create a public forum merely by permitting some speech."   *State of Tex. v. Knights of the Ku Klux Klan*, 58 F.3d 1075, 1078 (5th Cir. 1995).

When the forum is nonpublic, the First Amendment still applies—albeit with reduced force. "Implicit in the concept of the nonpublic forum is the right to make distinctions in access on the basis of subject matter and speaker identity."   *Perry Educ. Ass'n*, 460 U.S. at 49.   "The touchstone for evaluating these distinctions is whether they are reasonable in light of the purpose which the forum at issue serves."   *Id.*

Courts must uphold a governmental restriction on speech in a nonpublic forum as long as the restriction is reasonable and viewpoint-neutral.   *See id.* at 46; *Cornelius*, 473 U.S. at 800; *see also Perry v. McDonald*, 280 F.3d 159, 170 (2d Cir. 2001) ("For instance, a state might be permitted to prohibit speech on scatalogical subjects, but it may not be able to prohibit the expression of particular views about such subjects.").   However, even in nonpublic forums, content regulations "must be scrutinized more carefully to ensure that communication has not been prohibited '"merely because public officials disapprove the speaker's view."'"   *U.S. Postal Serv.*, 453 U.S. at 132 (quoting *Consol. Edison Co. v. Pub. Serv. Comm'n*, 447 U.S. 530, 536 (1980) (quoting *Niemotko v. Maryland*, 340 U.S. 268, 282 (1951) (Frankfurter, J., concurring in result))).   However, "[t]he fact

that the State wishes to exclude only one group with a certain viewpoint does not alone make the exclusion viewpoint-based." *Knights of the Ku Klux Klan*, 58 F.3d at 1081.  Where the forum in question is comprised of or located on government property, the court's analysis must be mindful of "the special interests of a government in overseeing the use of its property." *See Consol. Edison Co.*, 447 U.S. at 539–40.

## II.    Application

There are no disputed material facts in this case.  Rather, the case wholly turns on a matter of law—whether the First Amendment required the DMVB to accept the SCV's specialty plate application.  The DMVB raises two lines of defense for its denial of SCV's proposed plate.  First, the DMVB argues specialty plates constitute government, rather than private, speech, and are therefore not protected by the First Amendment at all.  Alternatively, DMVB argues the specialty plates constitute only a limited public forum, or a nonpublic forum, and thus the SCV's application was properly rejected pursuant to viewpoint-neutral restrictions on content.  For the reasons given below, the Court rejects the first argument, but finds the second is well taken, as the record shows the specialty plate program is a nonpublic forum.

The Court will first determine whether the speech in question is government speech, before considering what type of forum the specialty plate program is under the First Amendment.  The Court will then address whether the regulations and state action in this case constitute viewpoint, or content, regulation, and if the restriction was a reasonable limitation.  Finally, the Court will explain why two prior decisions in the SCV's favor are unavailing here, before noting the same result would apply even if the specialty plate program constitutes a limited public forum.

A.      **Government or Private Speech**

As a threshold issue, the Court must determine whether the speech in question is government or private speech.  If it is government speech, then the First Amendment is inapplicable.  *Pleasant Grove City, Utah v. Summum*, 555 U.S. 467, 468 (2009) ("If petitioners were engaging in their own expressive conduct, then the Free Speech Clause has no application.  The Free Speech Clause restricts government regulation of private speech; it does not regulate government speech.").  The DMVB, citing *Pleasant Grove*, argues the program is government speech because the state, through the DMVB, retains final control over the content of specialty plates.  The DMVB further invokes Fifth Circuit cases, which have generally noted, citing *Pleasant Grove*, and *Johanns v. Livestock Marketing Ass'n*, 544 U.S. 550 (2005), the government "must exercise a high degree of control over speech" for "private speech to become the government's own." *Int'l Women's Day March Planning Comm. v. City of San Antonio*, 619 F.3d 346, 360 (5th Cir. 2010) (holding government support of marches did not transform the marches into government speech); *see also Pelts & Skins, LLC v. Landreneau*, 448 F.3d 743, 743–44 (5th Cir. 2006) (vacating and remanding, in light of *Johanns*, for determination of whether "Louisiana's alligator marketing program" was government speech, similar to the pro-beef advertising in *Johanns*, because of the degree of governmental control over the message).

The Court disagrees.  There is no dispute the content of specialty plates is proposed by the private, nonprofit entities who seek to have a specialty plate issued.  Although the DMVB exercises *final* control over whether any particular plate is accepted, and further ensures the content and formatting of proposed plates conforms with the various regulations, the reality is private groups,

not the government, compose the message to be placed on the specialty plates.  *See* Defs.' Mot. Summ. J. [#37-2], Ex. 3 (specialty plate brochure), at 2 ("Q. Who provides the plate design?  A. You do, though your design is subject to reflectivity, legibility, and design standards.  Depending on which approval route you choose, My Plates or TxDMV will work with your organization to help you understand those standards.").  The DMVB essentially acts as an editor, with right of refusal to publish, rather than as a speaker.

The DMVB asserts the Supreme Court placed final control at the center of government-speech analysis in *Pleasant Grove*.  However, this reads too much into the *Pleasant Grove* opinion, which was focused on the very different, and rather narrow, question of whether privately donated monuments placed in a public forum constitute government or private speech.  555 U.S. at 464.  The Supreme Court, noting (1) the limited space within parks, (2) the permanent nature of monuments, and (3) the import of the act of accepting a particular monument—which can operate as an endorsement of the message conveyed by the monument—found such monuments to be government speech.  *Id.* at 472–73, 478.  It is true the Supreme Court emphasized the government retained effective control over the message.  However, the court's analysis, distinguishing permanent monuments from speeches or marches, precludes any finding the specialty plates are government speech.  The Supreme Court distinguished monuments from speeches or other traditional First Amendment activities in public parks, because "public parks can accommodate only a limited number of permanent monuments."  *Id.* at 478.

> Speakers, no matter how long-winded, eventually come to the end of their remarks; persons distributing leaflets and carrying signs at some point tire and go home; monuments, however, endure. They monopolize the use of the land on which they stand and interfere permanently with other uses of public space. A public park, over the years, can provide a soapbox for a very large number of orators—often, for

> all who want to speak—but it is hard to imagine how a public park could be opened
> up for the installation of permanent monuments by every person or group wishing to
> engage in that form of expression.

*Id.* at 479.  Nor does *Pleasant Grove* purport to set out an "effective control" litmus test for whether speech is private or government.  Rather, the city's control over the monuments in question appears to have simply been one consideration, albeit an important one, in finding the monuments constituted government speech.  Nor is there any indication the *Pleasant Grove* opinion was intended to supplant the Supreme Court's then-recent explanation of government speech set forth in *Johanns*, discussed below, in which the speech was directed by the government "from beginning to end."  544 U.S. at 560–61.

Here, by contrast, there is practically no limit to the number of specialty plates the state could approve and issue, because putting a particular specialty plate on one person's car in no way precludes the placement of a different plate on a different vehicle.  The plates do not "monopolize" public space.  *See id.*  Indeed, a review of the DMVB's website shows some seventy-four plates for various nonprofit organizations are presently available, and no doubt more are on the way.[13]  *See TxDMV–Special Plate Order Application*, Tᴇx. Dᴇᴘ'ᴛ ᴏꜰ Mᴏᴛᴏʀ Vᴇʜɪᴄʟᴇs, https://rts.texasonline.state.tx.us/NASApp/txdotrts/SpecialPlateOrderServlet?grpid=60 (last visited Apr. 8, 2013).  Nor do specialty plates endure as do permanent monuments—they are only issued and renewed for so long as a driver continues to pay the annual $30 additional fee.  Finally, the act of issuing specialty plates does not have the same import as the "dramatic" act of accepting a monument in a public park.  *See Pleasant Grove*, 555 U.S. at 474 (noting the city's decision to

---

[13]And this is not counting the bewildering array of available "MyPlates," *see* Mʏ Pʟᴀᴛᴇs.ᴄᴏᴍ, http://www.myplates.com/ (last visited Apr. 9, 2013), or other plates available through the DMVB, memorializing colleges, universities, and sports teams.

accept and display a privately funded monument constituted a "dramatic form of adoption" of the message conveyed by the monument).  As such, the special concerns which informed the holding in *Pleasant Grove* are wholly absent in this case, and the various specialty plates are more akin to speeches and other transitory uses of First Amendment forums, than to permanent monuments.

The DMVB also relies on *American Civil Liberties Union of Tennessee v. Bredesen*, 441 F.3d 370 (6th Cir. 2006), in which the Sixth Circuit found a special license plate constituted government speech.  However, *Bredesen* is factually distinct from this case, and actually illustrates why the SCV's plate is not government speech.  There, the challenged specialty plate was created at the express and specific direction of the Tennessee legislature.  *Id.* ("In 2003, the Tennessee legislature passed a law . . . authorizing issuance of a specialty license plate with a 'Choose Life' logotype 'designed in consultation with a representative of New Life Resources.'").  In other words, it was a plate akin to the various plates directly authorized by the Texas legislature, not the specialty plate program the SCV applied under.  Although the Tennessee legislature did assign the design work to a private party—New Life Resources—the fact remains the plate was created because the legislature passed a specific act making it so.  *See id.* ("The Tennessee legislature chose the 'Choose Life' plate's overarching message and approved every word to be disseminated.").  Here, by contrast, no act of the Texas legislature specifically authorized the SCV's plate—if it had, this lawsuit would not have occurred.

In addition, finding the specialty plate program is private speech comports with the Supreme Court's holding in *Johanns v. Livestock Marketing Ass'n*, where the court found "[t]he message set out in the beef promotions is from beginning to end the message established by the Federal Government," because "Congress has directed the implementation of a 'coordinated program'" to

-23-

promote beef consumption.  544 U.S. 550, 560–61 (2005).  There, Congress and the Secretary of Agriculture directed "in general terms" what message was to be conveyed.  *Id.* at 561.  The entity charged by Congress to promote beef consumption, the Beef Board, was "answerable" to the government, in that it was composed of members who were all subject to removal by the Secretary, and half of whom were appointed by the Secretary.  *Id.* at 560–61.  By contrast, here neither the Texas legislature, nor the DMVB, initiate the content of the DMVB-approved specialty plates.  Nor are the private nonprofit entities—the ones who in fact propose the content of the plates—answerable to any part of the state government.

Finally, the Court notes the "government speech" doctrine is still relatively new, and its precise contours are uncertain.  *Pleasant Grove*, 555 U.S. at 481 (Stevens, J., concurring).  As such, Justice Souter cautioned (regarding the Supreme Court's finding monuments were government speech), "it would do well for us to go slow in setting its bounds, which will affect existing doctrine in ways not yet explored."  *Id.* at 485 (Souter, J., concurring).  The Court is heedful of this warning, particularly because Souter went on to say, in words which are apposite here:

> After today's decision, whenever a government maintains a monument it will presumably be understood to be engaging in government speech.  If the monument has some religious character, the specter of violating the Establishment Clause will behoove it to take care to avoid the appearance of a flatout establishment of religion, in the sense of the government's adoption of the tenets expressed or symbolized.  In such an instance, there will be safety in numbers, and it will be in the interest of a careful government to accept other monuments to stand nearby, to dilute the appearance of adopting whatever particular religious position the single example alone might stand for.  As mementoes and testimonials pile up, however, the chatter may well make it less intuitively obvious that the government is speaking in its own right simply by maintaining the monuments.

> If a case like that occurred, as suspicion grew that some of the permanent displays were not government speech at all (or at least had an equally private character associated with private donors), a further Establishment Clause prohibition

would surface, the bar against preferring some religious speakers over others.  But the government could well argue, as a development of government speech doctrine, that when it expresses its own views, it is free of the Establishment Clause's stricture against discriminating among religious sects or groups. Under this view of the relationship between the two doctrines, it would be easy for a government to favor some private religious speakers over others by its choice of monuments to accept.

*Id.* at 486–87 (citation omitted).  The record in this case shows several specialty plates—approved and available to the public—contain references to God, or Christian symbols.  Were the Court to find specialty plates are government speech, analogous to the monuments at issue in *Pleasant Grove*, then the scenario predicted by Justice Souter in 2009 has already come to pass.

The Court thus finds the contents of specialty plates are private speech.  As such, First Amendment protection is available to the SCV, and the Court must proceed to determine what type of forum the plate program is.

## B.    Type of Forum

As a preliminary to First Amendment forum analysis, the Court concludes—and there appears to be no dispute—the forum at issue is the specialty plate program administered by the DMVB, and the plates themselves, not the separate MyPlates.com program, nor the public streets on which specialty plates are seen.  This is because determining the relevant forum is based on the "access sought by the speaker."  *Perry Educ. Ass'n*, 460 U.S. at 45; *see also Knights of the Ku Klux Klan*, 58 F.3d at 1078 (holding the forum in question was the "Adopt-a-Highway" program and its associated signs, rather than the public highways in general).  However, in dispute is what type of forum the DMVB's specialty plate program is under First Amendment jurisprudence.

There is no suggestion the specialty plates are a traditional public forum.  To the contrary, license plates, rather than being a place for people to gather, are discrete pieces of government-

controlled property, serving the government's purposes of identifying vehicle ownership, regulating access to motor vehicles, and generating revenue.  They are hardly venues for public debate since time immemorial.  Instead, the question is whether the specialty plate program constitutes a designated public forum, a limited public forum, or a nonpublic forum.

Here, the record does not disclose any "clear intent" by the state of Texas to create a public forum.  *Cornelius*, 473 U.S. at 802.  Rather, the record shows the state, while allowing limited input from certain members of the public, has nevertheless "reserve[d] the forum for its intended purpos[e]."  *Perry Educ. Ass'n*, 460 at 46.  The state, via its agency, the DMVB, retains final control over the content of specialty plates.  *See Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260,  268–69 (1988) (noting school retained ultimate control over the content of a school newspaper, and the purpose of paper was educational rather than expressive, as part of the course curriculum); 43 Tex. Admin Code § 217.28(i)(7).  In addition, although it is unclear whether the state retains formal title to the physical plates after they are issued, the state does retain ownership of the designs.  Tex. Transp. Code § 504.002.  Moreover, the state exercises ongoing control over the physical disposition of all license plates.  *See id.* § 504.008(g) ("If the owner of a motor vehicle for which a specialty license plate is issued disposes of the vehicle or for any reason ceases to be eligible for that specialty license plate, the owner shall return the specialty license plate to the department."); *id.* § 504.901 (providing for DMVB oversight of transfer of plates between vehicles, and further requiring "dispos[al] . . . in a manner specified by the department," of any plates which are removed from a vehicle and not transferred to another); 43 Tex. Admin. Code § 217.41(b)(2)–(3) (requiring plates which are not approved for transfer either be "disposed of in a manner that renders the license

-26-

plates unusable or that ensures the license plates will not be available for fraudulent use on a motor vehicle," or retained by the owner of the vehicle they were removed from).

Any doubt is dispelled by assessing the indicia discussed in *Cornelius*, 473 U.S. at 802–04. First, Texas has limited participation in the DMVB-approved specialty plate forum to certain groups. Second, Texas, through the DMVB, retains full and final control over what messages are conveyed via the program. Third, the scope of speech which is possible through the program is very limited. Finally, the statute and regulations do not suggest the government's intent was to establish a public forum.

### 1.      Limited Access

An important factor in determining if a forum is public or not is whether the government has limited who may participate in the forum. "In *Cornelius*, the Supreme Court noted that the government's consistent policy had been to limit participation in the fundraising campaign to certain voluntary agencies. The Court noted that this practice was inconsistent with an intent to create a public forum." *Knights of the Ku Klux Klan*, 58 F.3d at 1079 (citing *Cornelius*, 473 U.S. at 804). Similarly, participation in the DMVB's specialty plate program is limited to nonprofit entities. TEX. TRANSP. CODE § 504.801(b) ("Any nonprofit entity may submit an application . . . ."); *id.* § 504.801(i) ("The sponsor of a new specialty plate may not be a for-profit enterprise."). This is confirmed by the fact the Texas legislature created two separate avenues for obtaining distinctive license plates with no such limitation, the so-called "MyPlates" program, and of course the possibility of lobbying members of the Texas legislature to create particular licence plates by statute. These limitations are a strong indication the specialty plate program is not intended to be a public forum. *See id.*

This result is consistent with the Supreme Court's holding in *Perry Education Association*: "If by policy or by practice the Perry School District has opened its mail system for indiscriminate use by the general public, then PLEA could justifiably argue a public forum has been created. This, however, is not the case." 460 U.S. at 47. Here the state has neither by policy, nor practice, opened the specialty license plate program to indiscriminate use by the general public. Rather, only qualified nonprofit entities are eligible. *See id.* ("We can only conclude that the schools do allow some outside organizations such as the YMCA, Cub Scouts, and other civic and church organizations to use the facilities. This type of selective access does not transform government property into a public forum."). A further limitation is applicants must obtain the sponsorship of a state agency to receive the monetary benefits of the program.

## 2.    State Control

There is no dispute the DMVB retains the final say on any proposed specialty plate, both as to the final form, and as to whether a plate should issue at all. 43 TEX. ADMIN. CODE § 217.28(i)(7). This is a further indication the specialty plate program is a nonpublic forum. *See Cornelius*, 473 U.S. at 803; *Knights of the Ku Klux Klan*, 58 F.3d at 1078.

## 3.    Limited Scope of Speech

As a practical matter, the scope of speech permitted within the specialty plate program is very limited. This is due not only to the physical confines of a license plate, but also to the regulations governing specialty plate applications. Specialty plates may: (1) vary the color of the word "Texas" at the top, (2) apply a logo, within an area only a few square inches, on the left-hand side of the plate, (3) append twenty-five characters of text, in any color, at the bottom of the plate, and (4) optionally include or omit the silhouette of the state of Texas, in the upper right-hand corner. *See* Defs.' Mot.

Summ. J. [#37-2], Ex. 2, att. A at 1 (specialty plate design template). As such, no detailed message or discussion is possible, or permitted.[14] To be sure, this factor is not dispositive alone, but it provides additional confirmation the specialty plate program is a nonpublic forum. *See Cornelius*, 473 U.S. at 802 ("The Court has also examined the nature of the property and its compatibility with expressive activity to discern the government's intent."); *Knights of the Ku Klux Klan*, 58 F.3d at 1078 ("Such limitations on the quantity and content of speech are indicative of an intent to maintain a nonpublic forum.").

### 4.      No Expressed Intent to Create a Public Forum

A further factor is the absence of any expression of intent to establish a public forum. *Knights of the Ku Klux Klan*, 58 F.3d at 1078. For example, Chapter 504, subchapter A, entitled "General Provisions," and specifically section 504.008, "Specialty License Plates," contains no suggestion the legislature's purpose was to create a public forum. TEX. TRANSP. CODE § 504.008. Similarly, the relevant "Purpose and Scope" subsection of the Administrative Code merely references the DMVB's statutory duties to "issu[e] a plate or plates, . . . that, when attached to a vehicle as prescribed by the department, act as the legal registration insignia," including specialty plates. 43 TEX. ADMIN. CODE § 217.28(a). The subsection goes on to explain, "For the department to perform these duties efficiently and effectively, this section prescribes the policies and procedures for the application, issuance, and renewal of specialty license plates, symbols, tabs, and other devices, through the county tax assessor-collectors, and establishes application fees, expiration dates,

---

[14]The Court is mindful a symbol alone, or even a single word, can constitute protected speech under the First Amendment. The Court does not suggest the practical limits of what can be expressed on a license plate renders such speech unprotected. Rather, the limited scope of expression is simply one factor among several the Court looks to in determining whether the specialty plate program is a public forum. *See Cornelius*, 473 U.S. at 802.

and registration periods for certain specialty license plates." *Id.*  Absent is any hint the legislature

or the DMVB is seeking to further First Amendment expression. *See Knights of the Ku Klux Klan*,

58 F.3d at 1078 ("Any opportunity for speech provided by the Program is peripheral to that central

purpose [of facilitating litter control].").

As such, viewed in light of the rubric elided in *Cornelius*, the record here fails to show any

intent, clear or otherwise, to create a public forum.

Finally, this result is governed by the Fifth Circuit's holding in *Knights of the Ku Klux Klan*.

There, the Court of Appeals determined the state's "Adopt-a-Highway" signs were a nonpublic

forum. *Id.* at 1078–79.  The Adopt-a-Highway signs were similar to specialty plates: both allow for

little more than displaying the name of the participating entity.  *Id.*  It is true the specialty plate

program also permits the display of a logo, and so does provide for a modestly increased degree of

expression.  However, in another sense the Adopt-a-Highway program was vastly more open than

the specialty plate program, because for-profit entities could participate, whereas the specialty plate

program at issue here is exclusively limited to nonprofit entities.  *Id.* at 1079.  The specialty plate

program is further limited by the requirement—absent from the Adopt-a-Highway program—of a

sponsoring state agency in order to obtain the full benefits of the program.  Also much like specialty

plates, "[t]he State restricts and controls the size and content of the [Adopt-a-Highway] signs posted

at the ends of the adopted miles."  *Id.*  Corresponding to the specialty plate program's approval

process, all Adopt-a-Highway applications were subject to approval by the Department of

Transportation.  *Id.*  Taking all of these factors together, the Court is constrained under Fifth Circuit

precedent to conclude the specialty plate program is, like the Adopt-a-Highway program, a nonpublic

forum.[15]  *Id.* (holding the foregoing factors were "inconsistent with an intent to create a public forum").

Much as school newspapers, *Hazelwood Sch. Dist.*, 484 U.S. at 267–68, mail boxes, *U.S. Postal Serv.*, 453 U.S. at 129–130, interschool mail systems, *Perry Educ. Ass'n*, 460 U.S. at 46–47, government-organized, work-place charity drives, *Cornelius*, 473 U.S. at 806, and Adopt-a-Highway signs, *Knights of the Ku Klux Klan*, 58 F.3d at 1078–79, are all nonpublic forums,[16] the Court finds the specialty plate program is a nonpublic forum, as it is not a traditional public forum, nor does the evidence establish the government's "clear intent" to designate the program as a public forum.[17]

## C.   Viewpoint or Content Discrimination

As the specialty plate program constitutes a nonpublic forum, the next question is whether the DMVB nevertheless engaged in constitutionally impermissible viewpoint discrimination, or if

---

[15]SCV attempts, in a footnote, to distinguish *Knights of the Ku Klux Klan*, but its sole argument for doing so is the following: "[U]nlike the highway adoption program . . . the specialty license plate program was specifically created to allow for personal expression by sponsoring organizations and drivers, and has as one of its primary purposes 'the provision of a forum for expressive activity.'" Pls.' Resp. [#39] at 6 n.3 (quoting *Knights of the Ku Klux Klan*, 58 F.3d at 1078). However, the SCV cites no authority or evidence in the record showing a "primary purpose" of the specialty plate program was to provide a forum for expressive activity, other than a quote from the *Knights* opinion, which of course does not speak to the purposes of the specialty plates program. To the contrary, the evidence, and the laws and regulations governing the specialty plates program, suggest its primary purpose is to generate revenue. *See* TEX. TRANSP. CODE § 504.702(b)(2), (e) (requiring $8,000 deposit for specialty plate applications); TEX. ADMIN. CODE § 217.28(i)(2)(D), (E) (requiring inclusion of "projected sales of the plate, including an explanation of how the projected figure was established," and "a marketing plan for the plate, including a description of the target market," in all specialty plate applications); *id.*(i)(5)(C) (directing the DMVB to consider, *inter alia*, the applicant's ability to comply with the deposit requirement). Moreover, SCV's argument amounts to no more than begging the question of whether the specialty plates forum is some type of public forum.

[16]By contrast, Supreme Court cases which rejected attempts to characterize limited or designated forums as nonpublic forums involved physical locations which permitted actual discourse in a traditional sense. *See Cornelius*, 473 U.S. at 802–03  (noting university campus, open school board meetings, municipal auditorium, and city-leased theater were all physically compatible with use as public forums).

[17]Further support is found in the Second Circuit's decision in *McDonald*, where Vermont's vanity plate program was held to be a nonpublic forum because (1) the primary purpose of license plates is vehicle identification, (2) the vanity plate program was aimed at raising revenue, rather than facilitating expression, (3) the state retained numerous restrictions on the program, similar to those at issue here, (4) the state retained final control over any plate, and (5) the nature of the plates made them an "unlikely means" to engage in meaningful debate. 280 F.3d at 167–68.

rejection of the SCV's application was permissible content discrimination.  Having carefully reviewed the record, and mindful of the duty to closely scrutinize purported content discrimination to ensure it is not, in fact, viewpoint-based, *see U.S. Postal Serv.*, 453 U.S. at 132, the Court concludes the DMVB's decision was content, rather than viewpoint, based, and therefore not offensive to the First Amendment, *see Knights of the Ku Klux Klan*, 58 F.3d at 1080–81 ("There is no indication in the record that the State's attempt to prevent the Klan from adopting a section of highway outside of Vidor is actually motivated by a desire to suppress the Klan's viewpoint.").

The Supreme Court has repeatedly upheld content-based exclusions in nonpublic forums, and cautioned that not all government property is a public forum.  *Jones v. N.C. Prisoners' Union*, 433 U.S. 119, 134 (1977) (holding a prison is not a public forum, and upholding regulations on most speech by purported prisoners' union); *Greer v. Spock*, 424 U.S. 828, 838–39 (1976) (holding federal military reservation was not a public forum, and approving of base policy which permitted other civilian speakers, but barred all political speakers); *Lehman v. City of Shaker Heights*, 418 U.S. 298, 303–04 (1974) (plurality opinion) (finding advertising cards on public transit system were not a public forum, and therefore upholding ban on any political advertising).  Although the foregoing three cases arguably involved unusual facts, the Supreme Court affirmed these cases lie within the mainstream of First Amendment jurisprudence in *Perry Education Association*: "It will not do, however, to put aside the Court's decisions holding that not all public property is a public forum, or to dismiss *Greer*, *Lehman*, and *Jones* as decisions of limited scope involving 'unusual forums.'" 460 U.S. at 49 n.9.  Nor is *Perry Education Association* the only case to acknowledge *Lehman* and *Greer*'s importance.  *See Consol. Edison Co.*, 447 U.S. at 538 ("Nevertheless, governmental regulation based on subject matter has been approved in narrow circumstances. . . . [T]his Court has

recognized that the government may bar from its facilities certain speech that would disrupt the legitimate governmental purpose for which the property has been dedicated.").

SCV has no evidence the DMVB discriminated against it on the basis of viewpoint. Indeed, there is no hint in the record the defendant board members ever considered the SCV's viewpoint. Rather, their concerns were entirely focused on the appearance of the Confederate battle flag within the SCV's logo, finding "specifically the confederate flag portion of the design" to be derogatory. Pls.' Mot. Summ. J. [#35-12], Ex. J, at 1. This is mirrored by the public comments the DMVB based its finding on, which focused on the battle flag, not the group requesting the specialty plate. The closest thing to a criticism of the SCV itself was a comment by Gary Bledsoe, who argued, "though there are good people in the Sons of Confederate Veterans, there are many there who are appended to or connected with other hate organizations . . . ." Defs.'s Mot. Summ. J. [#37-4], Ex. 6 (Nov. 10, 2011, DMVB Board meeting transcript), at 25 [hereinafter Nov. Trans.]. All the other comments the DMVB received were directed at the battle flag itself, and its meaning. Rather than criticizing the SCV, or discussing its mission of commemorating the service of Confederate troops, the various negative commentators discussed the meaning of the battle flag.

First, the participants debated whether the battle flag had ever been flown "over" Texas, i.e., as the sovereign flag of the state, with General Land Office Commissioner Jerry Patterson explaining it was probably used in battles which occurred within the state, and certainly was carried by Texas troops in battle elsewhere, as part of the Army of Northern Virginia. Then, numerous participants, including Congressman Lloyd Doggett, and many African-Americans, particularly members of the NAACP and local pastors, forcefully expressed the opinion the battle flag is a symbol of racism,

oppression, and division.[18]  Similarly, many of the speakers warned putting the Confederate battle flag on a state-sanctioned license plate would make it appear the state endorsed racist views.  These same commentators likewise opined Texas should be moving away from racial division, not towards it.[19]  One speaker went so far as to suggest the Confederate battle flag and the Nazi swastika are "one and the same."  *Id.* at 56.  In what may have been a bit of shameless showboating, or perhaps a moving and emotional moment at the meeting (the cold record cannot convey the atmosphere), Congressman Al Green opined American troops serving in Afghanistan and Iraq fought for the American flag, not the Confederate flag, and proceeded to lead the audience in the pledge of allegiance.  Finally, Congresswoman Sheila Jackson Lee echoed several of the above sentiments, and also suggested rejecting the SCV's application would not violate the First Amendment.  In any event, with the possible and passing exception of Mr. Bledsoe's comment, quoted above, the debate was entirely focused on the meaning of the Confederate battle flag, not on the meaning of the SCV logo per se, nor on the views, merits, or values of the SCV itself.

---

[18]One example of these comments will suffice:

> When I was ten years old we walked to school, to the black school. There was a white school where the white kids rode the bus, there was another white school that was a private school, and every morning as we walked on the sidewalks as black people, the white private school would ride by in their bus very slowly, spit out the window in our faces and display a Confederate battle flag.  Every year in our school when they talked about the death of M.L.K., the white kids would bring in the Confederate battle flag and hold it up as a symbol of power.
> All my life in Georgia and Alabama and the whole South, it was very clear what the symbol meant.  In fact, if you study the history of Georgia and Alabama, you see crime[] scenes where black folks were lynched, murdered and killed, and other relics like the flag were always on display.

Nov. Trans. [#37-4] at 53–54 (comments of Nelson Linder).

[19]The letters from nineteen state representatives, and the mayor of Houston, were in a similar vein to the sentiments summarized in the preceding three sentences.  *See* Defs.' Mot. Summ. J. [#37-3], Ex. 5.

Significantly, Commissioner Patterson, who was the first person to speak at the November hearing, started off his remarks not by describing the qualities of the SCV, but by quoting infamously ironic statements by Abraham Lincoln and Robert E. Lee, the former suggesting the Great Emancipator in fact harbored racist sentiments, and the latter tending to show General Lee opposed slavery and desired to see all slaves emancipated.[20]  While these quotes help illustrate the complexity of the causes of the Civil War, they also further confirm the problem with the specialty plate at issue here has nothing to do with the SCV itself or any viewpoint it holds, but with the meaning of the Confederate battle flag, which has, unfortunately, become inseparably connected with racial tensions.

Reviewing the record, there is no indication the DMVB denied SCV's application either because of the identity of the applicant, or because SCV espouses a positive viewpoint regarding the battle flag.  Rather, the record demonstrates conclusively the decision was based on the content of the message.  *See McDonald*, 280 F.3d at 170 ("It is apparent that Vermont's policy does not oppose

---

[20]Patterson attributed the following to Abraham Lincoln:

"I will say then that I am not, nor have I ever been, in favor of bringing about in any way the social and political equality of the white and black races, that I am not now, nor have I ever been, in favor of making voters or jurors of Negroes, nor of qualifying them to hold office, not to intermarry with white people, and I will say in addition to this that there is a physical difference between the white and black races which I believe will forever forbid the two races living together on terms of social and political equality.  And inasmuch as they cannot so live, while they do remain together, there must be a position of superior and inferior, and I, as much as any other man, am in favor of having the superior position assigned to the white race."

Nov. Trans. at 7–8.  He quoted from Robert E. Lee thus:

"In this enlightened age there are few, I believe, but what will acknowledge that slavery as an institution is immoral and political evil in any country.  I think it, however, a greater evil to the white than to the black race. . . . The emancipation will sooner result from the mild and melting influence of Christianity than the storms and tempests of fiery controversy.  While we see the course of final abolition of human slavery is onward and we give the aid of our prayers and all justifiable means in our power."

*Id.* at 8–9.  Of course, posterity has judged both men approvingly, but on the basis of their deeds, rather than the above words.

Perry's philosophical views as reflected in the vanity plate. Vermont's policy prohibits Perry's vanity plate not because it stands for 'Shit happens (so don't let life's problems drive you to drink),' but because Perry chose to express that viewpoint using a combination of letters that stands in part for the word 'shit.'  This restriction does not discriminate on the basis of viewpoint.").

A hypothetical confirms that what is before the Court is a question of content, rather than viewpoint.  Imagine a historical society, we might call it, the "Axis & Allies Society," dedicated to studying all aspects of the Second World War from a nationally neutral and objective point of view. Accordingly, as its logo, it chooses some design which incorporates the various national symbols used by all the major combatants: a white star for the United States, the British tri-colored roundel, the rising sun of imperial Japan, the hammer and sickle of the Soviet Union, and the swastika of the Third Reich.  If the historical society sought a specialty license plate using its composite logo, the design would properly be rejected under the specialty plate rules, not due to the (entirely unobjectionable) viewpoint of the society, but due to the derogatory content of its logo, specifically the swastika.

The mere fact the content-based denial impacted the SCV, and would not affect applicant groups with a different viewpoint, is immaterial.  *See Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 763 (1994) ("In short, the fact that the injunction covered people with a particular viewpoint does not itself render the injunction content or viewpoint based."); *Knights of the Ku Klux Klan*, 58 F.3d at 1081 ("The fact that the State wishes to exclude only one group with a certain viewpoint does not alone make the exclusion viewpoint-based.").

The SCV repeatedly argues the fact the Buffalo Soldiers plate was approved indicates SCV was subjected to viewpoint discrimination.  SCV speculates Native Americans would be offended

by the Buffalo Soldiers plate, because of the role played by African-American troops in the frontier wars of the nineteenth century.  However, the record does not support this assertion: in contrast to the chorus of negative public comments raised against the SCV's plate, there appears to have been no significant objection to the Buffalo Soldiers plate, rendering SCV's assertion the Buffalo Soldiers plate is equally derogatory at best purely speculative.  Indeed, the Buffalo Soldiers plate elicited only brief remarks at the November 2011 hearing: First, Commissioner Patterson spoke in favor of it, albeit mostly as a way of suggesting the SCV plate should also be adopted, by equating the service of Confederate servicemen with that of the Buffalo Soldiers.[21]  Specifically, Patterson suggested anyone offended by either plate should "get a grip."  *Id.* at 10  Second, Captain Paul J. Matthews, the founder of the Buffalo Soldiers National Museum in Houston, objected to such comparisons, asserting the Buffalo Soldiers were "peacekeepers" who fought to defend the American flag, whereas "the Confederacy fought to destroy [it]."[22]  *Id.* at 75.  Finally, when the Buffalo Soldiers plate was actually before the DMVB, there were no speakers against it, and after brief remarks in favor by two speakers, it was approved.

More importantly, the content of the Buffalo Soldiers plate, unlike the SCV's design, is quite innocuous, consisting simply of the words "Buffalo Soldiers," a buffalo, and a crossed rifle and sabre.  No inflammatory symbol comparable to the Confederate battle flag appears on the Buffalo Soldiers plate, nor is there any evidence those symbols are derogatory to any person.  As such, the

---

[21]When Patterson was recognized to speak regarding the SCV plate, he also spoke in favor of the Buffalo Soldiers plate, even though it was technically a separate agenda item, to be considered after a vote on the SCV plate. Patterson was apparently losing his voice, and left the hearing before the DMVB turned to the Buffalo Soldiers plate. Captain Matthews, the principal behind the Buffalo Soldiers plate, voiced his objection to the comparison during the SCV discussion, and also spoke in favor of the Buffalo Soldiers plate when the floor was opened for comments on it.

[22]It bears noting this was one of the few negative remarks made about the Confederacy, as opposed to the battle flag as a symbol.

DMVB's approval of the Buffalo Soldiers plate is not evidence SCV was subjected to viewpoint discrimination. Rather, it confirms the DMVB was evenhandedly applying a permissible, content-based restriction on use of a nonpublic forum.

The Court thus finds rejection of the SCV's application was a content-based restriction on speech, rather than a viewpoint-based limitation. Because the restriction is one of content only, and because the specialty plates constitute a nonpublic forum, the Court concludes SCV's First Amendment rights were not *per se* violated by the DMVB's refusal to issue a specialty plate bearing the Confederate battle flag logo used by the SCV. *See Perry Educ. Ass'n*, 460 U.S. at 49 ("Implicit in the concept of the nonpublic forum is the right to make distinctions in access on the basis of subject matter . . . ."). Having so concluded the only remaining issue is the reasonableness of the restriction.

**D.      Is the DMVB's Restriction Reasonable?**

Content-based restrictions on speech in a nonpublic forum are reviewed under a reasonableness standard. *Perry Educ. Ass'n*, 460 U.S. at 46. "The reasonableness of a government restriction of access to a nonpublic forum is assessed 'in the light of the purpose of the forum and all the surrounding circumstances.'" *Knights of the Ku Klux Klan*, 58 F.3d at 1079 (quoting *Cornelius*, 473 U.S. at 809).

"Automobile license plates are governmental property intended primarily to serve a governmental purpose, and inevitably they will be associated with the state that issues them." *McDonald*, 280 F.3d at 169. Consequently, the state of Texas has a legitimate, significant interest in excluding derogatory content from specialty plates. The DMVB was presented with ample evidence, which the Court has summarized above, of the racially derogatory message connoted by

-38-

the Confederate battle flag.  Several Courts of Appeals opinions have likewise recognized this unfortunate fact.  *E.g.*, *Scott*, 324 F.3d at 1248–49.  Accordingly, there is no doubt the DMVB was authorized by generally applicable rules and the statute to reject the SCV's application.  Given the apparent purposes of the specialty plate program are variously to (1) regulate and identify motor vehicles, (2) generate revenue for the state, and (3) provide limited financial support for nonprofit groups, rather than to set up an open, First Amendment forum, the Court finds it was reasonable for the state to exclude derogatory content generally from the specialty plate program.  It was also imminently reasonable for the DMVB to conclude the Confederate battle flag portion of the SCV's application was such derogatory content.[23]

This restriction is also reasonable in light of how little it otherwise burdens the SCV's First Amendment rights.  The SCV's members are free to put their logo anywhere else on their vehicles, except for the state-issued license plates.  *See McDonald*, 280 F.3d at 169 ("Moreover, Vermont's policy does not prevent Perry from communicating any particular message on her automobile.  For instance, Perry may display a bumper sticker bearing the letters SHTHPNS if she so desires.").  They are further free to put up signs with the SCV logo on their own property, or elsewhere with the owner's permission.  They are likewise free to publish the logo wherever they may.  They may even lobby the legislature to obtain a statutory plate.[24]  As such, consistent with the Supreme Court's

---

[23]However, the Court finds the alternative basis advanced by the DMVB, premised on a supposed threat to public safety, by which the controversial nature of the battle flag would "distract or disturb drivers to the point of being unreasonably dangerous" is not reasonable.  There was scant evidence before the DMVB to support such a finding.  In addition, vague, "public safety" standards are no standard at all in First Amendment analysis, and generally cannot support a restraint on speech.  *See Lewis v. Wilson*, 253 F.3d 1077, 1080–81 (8th Cir. 2001).

[24]Although suggesting a petitioner for judicial relief should look to the legislative branch for assistance is usually the practical equivalent of there being no relief available, here the Texas legislature can and frequently has approved a variety of plates—including controversial plates, such as "Choose Life"—by direct legislative action.

nonpublic forum precedent, other avenues of speech remain fully available to the SCV.  *See Perry*

*Educ. Ass'n*, 460 U.S. at 53–54 ("The variety and type of alternative modes of access present here

compare favorably with those in other non-public forum cases where we have upheld restrictions on

access.") (citing *Greer*, 424 U.S. at 839; *Pell v. Procunier*, 417 U.S. 817, 827–28 (1974) (noting

prison inmates may communicate with media by mail and through visitors)).   The Court thus

concludes the ban on derogatory content, both facially and as applied, is reasonable, and does not

offend the First Amendment.

**E.      Prior Decisions in Favor of the SCV are Unavailing**

SCV relies heavily on the District Court of Massachusett's opinion in *Sons of Confederate*

*Veterans, Inc. v. Glendening*, 954 F. Supp. 1099 (D. Md. 1997).   The Court has carefully reviewed

this opinion, which is thoughtful and well written, but the Court finds it ultimately unpersuasive.

There, confronting very similar facts, Judge Smalkin concluded:

> The SCV and SCV–MD indisputably view the flag in their logo as representing
> "honor and chivalry in battle during the War between the States."   Presumably, the
> numerous, unnamed persons who complained to the [Motor Vehicle Administration
> (MVA)] view that same flag as a symbol of racial oppression and hostility.   In light
> of these divergent views, when the MVA Administrator, in response to "numerous
> complaints," halted the issuance of SCV–MD organization plates bearing the
> Confederate battle flag logo and ordered the recall of all previously issued such
> plates, it is plain beyond dispute that he advanced the viewpoint of those offended
> by the flag and discouraged the viewpoint of those proud of it.

*Id.* at 1103–04 (citations omitted).   The Maryland District court rested this conclusion on the

Supreme Court's seminal holding in *R.A.V. v. City of St. Paul*, 505 U.S. 377 (1992).   There, the

Supreme Court struck down a ban on placing swastikas, burning crosses, or similarly offensive

symbols on public or private property, when the actor in question knew or had reason to know doing

-40-

so would arouse anger, alarm, or resentment in others due to race, color, creed, religion, or gender.

*Id.* at 380.

> Displays containing abusive invective, no matter how vicious or severe, are permissible [under the ordinance] unless they are addressed to one of the specified disfavored topics. Those who wish to use "fighting words" in connection with other ideas—to express hostility, for example, on the basis of political affiliation, union membership, or homosexuality—are not covered. The First Amendment does not permit St. Paul to impose special prohibitions on those speakers who express views on disfavored subjects.

*Id.* at 391.  After quoting the foregoing, Judge Smalkin reasoned:

> Similarly, under the Defendants' guidelines, although the use of the Confederate battle flag logo to convey that the flag is a symbol of honor may be prohibited because it is a view that some may find offensive as racially hostile or degrading speech, the use of the flag (perhaps inside a red circle superimposed with an x) to denounce racism would presumably be permissible.  The First Amendment does not countenance such viewpoint discrimination, even for the purpose of suppressing speech that may be perceived as racially degrading or hostile.

*Glendening*, 954 F. Supp. at 1104.

The Court respectfully disagrees.  The ordinance at issue in *R.A.V.* was not viewpoint neutral; rather, it singled out some types of offensive speech, directed at particular groups, making that speech illegal, while allowing speech of an otherwise equally offensive content, if the viewpoint was directed at other, unprotected groups, such as "political affiliation, union membership, or homosexuality."  *R.A.V.*, 505 U.S. at 391.

With all due respect to Judge Smalkin, nothing in *this* record suggests a Confederate flag inside "a red circle superimposed with an x" would be permitted under the specialty plate regulations, which precludes application of Judge Smalkin's conclusion the similar regulations in *Glendening* were not viewpoint neutral.  Placing the Confederate battle flag inside a circle–x is obviously derogatory towards those Americans who fought for the Confederacy, and would therefore

offend the many people today who honor their service.  As such, a plate design featuring a crossed-out Confederate battle flag would be just as impermissible under the regulations as the SCV's attempt to positively display the battle flag.  For this reason, the regulations at issue here are distinguishable from the ordinance in *R.A.V.*, which, by protecting some groups, but not others, singled out some viewpoints as being impermissible, while allowing other viewpoints.  This is confirmed by a comparison of the text of the regulation in *R.A.V.*, which, as noted above described specific classes of persons who are protected, and specific types of conduct which was prohibited, with the regulation here, which prohibits any type of derogatory speech, no matter who it is directed towards.  *Compare id.* at 380 ("'Whoever places on public or private property a symbol, object, appellation, characterization or graffiti, including, but not limited to, a burning cross or Nazi swastika . . . on the basis of race, color, creed, religion or gender . . . .'"), *with* former 43 TEX. ADMIN. CODE § 217.28(c)(3) (defining "derogatory" as "an expression of hate directed toward people or groups that is demeaning to people or groups, or associated with an organization that advocates such expressions").

There is a further, very important, difference which *Glendening* did not consider.[25]  The ordinance in *R.A.V.* was sweeping, and extended to all property, public and private.  Under the ordinance, a landowner could not set up a swastika, or burn a cross, even on his own property.[26]

_____

[25]The Court does not suggest this was an oversight on Judge Smalkin's part.  Rather, having concluded the state's attempt to recall the Sons of Confederate Veterans' plates constituted impermissible viewpoint discrimination, the District Court of Maryland had no need to consider whether the Maryland plate program constituted a designated public forum, or a nonpublic forum, thus obviating any need to look at the other aspects of the ordinance in *R.A.V.  See Glendening*, 954 F. Supp. at 1103 ("The Court need not decide whether the organization plate is a public or nonpublic forum, however, because the MVA's actions constitute impermissible viewpoint discrimination in either forum . . . .").

[26]The ordinance also required knowledge or reason to know the conduct in question would cause offense, but it would be a rare person indeed who would put up those symbols and yet be unaware of their meaning.

Here, all that is restricted are the small areas of space taken up by the two license plates which Texas law requires be installed on all vehicles in the state.

SCV also relies heavily on a Fourth Circuit decision, however, it is factually distinct from this case. *Sons of Confederate Veterans, Inc. ex rel. Griffin v. Comm'r of the Va. Dep't of Motor Vehicles*, 288 F.3d 610 (4th Cir. 2002). There, the Fourth Circuit considered the following Virginia statute:

> On receipt of an application therefor and written evidence that the applicant is a member of the Sons of Confederate Veterans, the Commissioner shall issue special license plates to members of the Sons of Confederate Veterans. *No logo or emblem of any description shall be displayed* or incorporated into the design of license plates issued under this section.

VA. CODE § 46.2-746.22 (emphasis added).

The statute in question, and the related license plates, were all part of a special plate program by which the Virginia legislature authorized issuance of special plates to members and supporters of a variety of organizations. *Griffin*, 288 F.3d at 614. "In contrast to other Virginia statutes authorizing special plates for members or supporters of various organizations, this statute contains a restriction (the logo restriction) providing that '[n]o logo or emblem of any description shall be displayed or incorporated into the design of license plates issued under this section.'" *Id.* at 613 (quoting VA. CODE § 46.2-746.22). The Court almost need go no further in discussing *Griffin*. The Fourth Circuit unsurprisingly found the SCV had been singled out based on its viewpoint, because it was forbidden from including any logo (when all other groups were permitted a logo), and therefore struck down the statute. Indeed, the Fourth Circuit, after careful review of the relevant statutes, found:

> The logo restriction is the only restriction of its kind contained in any of the

numerous special-plate-authorizing statutes. A review of these numerous and varied statutes does not reveal any intent on the Commonwealth's part to limit, on the basis of content, the scope of speech within the special plate forum in any principled way.

*Id.* at 626.

In stark contrast, no statute or regulation is directed against the SCV in Texas.  Rather, the DMVB cited the general prohibition on derogatory content, and safety concerns, in rejecting the SCV's application.  There is no suggestion in the record the SCV's application would have been denied if its logo did not contain the Confederate battle flag; unlike in *Griffin*, the state has not singled out the SCV and forbidden it to use *any* logo on a specialty plate.  As such, *Griffin* is distinguishable from this case.  In further distinction, the Texas legislature, unlike that of Virginia, has crafted a generally applicable, principled limit on content: the ban on derogatory content authorized by section 504.801, and effected by former section 217.28(c)(3) of the Administrative Code.  In sum, while *Griffin* reached a different result, the facts in *Griffin* stand in an illustrating contrast to the facts in this case, and thus the Court's findings here are not contrary to *Griffin*.

**F.    The Same Result Applies if the Specialty Plates are a Limited Forum**

Alternatively, the Court finds even if the specialty plate program constitutes a limited public forum, the rule against derogatory content passes muster within the Fifth Circuit for the same reasons, because restrictions in both nonpublic forums, and limited forums, are permissible so long as the restrictions are reasonable, and not based on opposition to the speaker's viewpoint.  *Chiu*, 260 F.3d at 347.  This is confirmed by a recent Supreme Court opinion regarding a limited forum.

The Supreme Court has reiterated that viewpoint-neutral restrictions on limited public forums are permissible, even when application of those restrictions falls more harshly upon some groups than others.  *Christian Legal Soc'y Chapter of the Univ. of Cal., Hastings Coll. of the Law v.*

-44-

*Martinez*, 130 S. Ct. 2971, 2978 (2010); *id.* at 2996 (Stevens, J., concurring) ("[I]t is a basic tenet of First Amendment law that disparate impact does not, in itself, constitute viewpoint discrimination."). There, the Supreme Court considered a student-fee funded, "registered student organization" (RSO) program. *Id.* at 2979 (majority opinion). The program, which was open to any student organization, allowed the use of Hastings' facilities, and provided financial support to qualifying student organizations. *Id.* Inclusion within the program, however, was predicated on the RSO's commitment to be open to "all-comers," meaning no student could be excluded from membership, or from the opportunity to compete for leadership within an RSO, on the basis of, *inter alia*, religion or sexual orientation. *Id.* at 2980–81. The Christian Legal Society was thus denied RSO status because it required its members to affirm their status as Christians, and to reject homosexuality as sinful. *Id.* However, Hastings allowed the Christian Legal Society free use of Hastings facilities for meetings; what was denied was access to certain RSO-only notice boards, and funding from student fees. *Id.* at 2981. The Supreme Court found this was not viewpoint discrimination, but rather was permissible limitation to a limited public forum. *Id.* at 2993.

What is instructive here is the Supreme Court held enforcing the "all-comers" rule, which of course negatively impacted the Christian Legal Society, but was readily complied with by other student organizations, nevertheless did not constitute viewpoint discrimination. *Id.* at 2994. In the same vein, the specialty plate rule precluding derogatory content has negatively impacted the SCV, but not other organizations. Nevertheless, just as Hastings was properly able to limit access to its limited public forum to those organizations which were able to conform to the viewpoint-neutral "all-comers" requirement, the Court finds Texas may properly limit the specialty plate forum to the viewpoint-neutral requirement that specialty plates not be derogatory in content. *See id.* Much as

the Christian Legal Society was seeking "not parity with other organizations, but a preferential exemption from" the challenged policy, so the SCV is seeking an exemption from the rule forbidding issuance of a specialty plate which contains derogatory content. *Id.* at 2978. As Justice Stevens succinctly put it in his concurrence, "Although the First Amendment may protect CLS's discriminatory practices off campus, it does not require a public university to validate or support them." *Id.* at 2996 (Stevens, J., concurring). Similarly, the First Amendment protects SCV's determination to honor the courage of Confederate troops, and likewise protects SCV's decision to adopt and display the Confederate battle flag as its symbol. However, the First Amendment does not require the state to endorse the battle flag by putting it on government-controlled property where the state does not want it.[27]

## Conclusion

It is a sad fact the Confederate battle flag has been coopted by odious groups as a symbol of racism and white supremacy. There is no reason to doubt the SCV and its members are entirely heartfelt in their condemnation of this misuse. It is to be hoped the passage of time, and efforts such as the SCV's resolution, will eventually remove a blight from the flag under which feats of great heroism and fortitude were accomplished. All the traditional avenues of public discourse are open to those who would fully redeem the battle flag. Nevertheless, the state of Texas has chosen to

---

[27]Of course, as any casual visitor to the Texas Capitol can attest, Texas is not averse to putting up public monuments which honor the service of Confederate troops. However, the legislature's decision there does not require it to put the Confederate battle flag anywhere a private citizen demands. Furthermore, the two large Confederate monuments on the Capitol grounds in fact illustrate why the state might be hesitant to endorse a plate consisting of little more than the battle flag. The monuments, one to Hood's Texas Brigade, the other to all armed forces of the Confederacy, feature statues of Confederate servicemen, and have detailed inscriptions memorializing their service. The battle flag is not a prominent feature on either monument. As such, there can be no mistake the state is endorsing the service of Confederate troops, not the latter-day, racist connotations of the battle flag.

abstain from this debate, and the First Amendment does not require it to open up state-issued license plates as an additional forum in which to contest the flag's meaning.

Accordingly,

IT IS ORDERED that Plaintiffs Texas Division, Sons of Confederate Veterans, Inc, et al.'s Motion for Summary Judgment [#35] is DENIED;

IT IS FINALLY ORDERED that Defendants Victor T. Vandergriff et al.'s Motion for Summary Judgment [#37] is GRANTED.

SIGNED this the 12th day of April 2013.

_____
SAM SPARKS
UNITED STATES DISTRICT JUDGE